**Scot L. ZIMMERMAN, Plaintiff–Appellant,**

v.

**State of OREGON DEPARTMENT OF JUSTICE, Defendant–Appellee.**

**No. 97–36101.**

United States Court of Appeals, Ninth Circuit.

July 28, 1999.

Before: KOZINSKI, KLEINFELD, and GRABER, Circuit Judges.

Order; Dissent by Judge REINHARDT.

### ORDER

The panel has voted to deny the petition for rehearing en banc.

The full court was advised of the petition for rehearing en banc. A judge of the court requested a vote on whether to rehear the matter en banc. The matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc consideration. Fed. R.App. P. 35.

The petition for rehearing en banc is DENIED.

REINHARDT, Circuit Judge, with whom Circuit Judges PREGERSON and MICHAEL DALY HAWKINS join, dissenting from the denial of reconsideration en banc.

I dissent from the court's refusal to reconsider, en banc, the panel's decision in this important case of national significance. The panel's opinion holding that Title II of the Americans with Disabilities Act (ADA) does not prohibit employment discrimination by public entities is directly contrary to the plain language of the statute, to the clearly expressed intent of Congress, and to the Department of Justice's authoritative implementing regulations. Moreover, the panel's opinion conflicts either directly or indirectly with the position taken by every circuit to confront the question, including ours, *see Norman–Bloodsaw v. Lawrence Berkeley Laboratory*, 135 F.3d 1260, 1272 (9th Cir.1998) (applying, without discussion, Title II to employment discrimination claim); *Bledsoe v. Palm Beach County Soil and Water Conservation Dist.*, 133 F.3d 816 (11th Cir.1998) (holding that Title II applies to employment discrimination); *Castellano v. City of New York*, 142 F.3d 58 (2d Cir.1998) (applying Title II to employee benefits discrimination claim); *Holmes v. Texas A & M*, 145 F.3d 681, 684 (5th Cir.1998) (applying Title II to employment discrimination claim); *Doe v. University of Maryland Medical Sys. Corp.*, 50 F.3d 1261 (4th Cir.1995) (applying Title II to employment discrimi-

---

nation claim using same standards as under Rehabilitation Act), as well as with 18 of the 21 published district court opinions addressing the issue.[1] The Ninth Circuit now stands alone in adopting an interpretation of the ADA that deprives disabled persons of a right expressly granted them by Congress—the right to bring an action for employment discrimination under Title II of the ADA.

## Overview

The panel holds that the "plain meaning" of Title II of the ADA excludes discrimination in employment from the otherwise broad anti-discrimination prohibition of that Title. Such is not only *not* the plain meaning of Title II, but the panel's interpretation is directly contrary to the express language of the Title, to the unequivocal legislative history of the Title and to the uniform administrative interpretations of the Title rendered by the agency charged by Congress with that function. Title II contains two independent clauses, each of which serves to prohibit discrimination in employment. The Title contains *no* language of exclusion and the panel points to none. Rather it relies on a concept of its own creation—"inputs" and "outputs"—a concept found nowhere in the statute, or in any of the pertinent materials, as well as on a structural argument not accepted by any other circuit court. The

panel's mode of statutory analysis at most results in a question of statutory ambiguity. However, if Title II were ambiguous, we would still be required by the applicable rules of statutory construction to hold that it covers every form of discrimination, including employment discrimination. Thus, the panel is compelled to base its decision exclusively on its plain meaning argument, an argument that cannot survive serious scrutiny.

### A. Plain Meaning of the ADA

The plain meaning of Title II is that it prohibits employment discrimination as well as all other forms of discrimination by public entities against the disabled. The ADA was enacted by Congress in 1990 "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). Title II provides that no disabled individual:

> shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity.

42 U.S.C. § 12132. The panel concludes that this language obviously and *unambiguously* excludes discrimination in employment from its purview. Yet, there is noth-

---

1. *Saylor v. Ridge,* 989 F.Supp. 680 (E.D.Pa. 1998); *Magee v. Nassau County Medical Center,* 27 F.Supp.2d 154 (E.D.N.Y.1998); *Fobar v. City Dearborn Heights,* 994 F.Supp. 878 (E.D.Mich.1998); *Alberti v. City and County of San Francisco,* 32 F.Supp.2d 1164 (N.D.Cal. 1998); *Downs v. Massachusetts Bay Transp. Auth.,* 13 F.Supp.2d 130 (D.Mass.1998); *Winfrey v. City of Chicago,* 957 F.Supp. 1014 (N.D.Ill.1997); *Dominguez v. City of Council Bluffs,* 974 F.Supp. 732 (S.D.Iowa 1997); *Hernandez v. City of Hartford,* 959 F.Supp. 125 (D.Conn.1997); *Roe v. County Comm'n of Monongalia,* 926 F.Supp. 74 (N.D.W.Va. 1996); *Graboski v. Guiliani,* 937 F.Supp. 258 (S.D.N.Y.1996); *Wagner v. Texas A & M Univ.,* 939 F.Supp. 1297 (S.D.Tex.1996); *Davoll v. Webb,* 943 F.Supp. 1289 (D.Colo.1996); *Dertz v. City of Chicago,* 912 F.Supp. 319 (N.D.Ill. 1995); *Doe v. County of Milwaukee,* 871 F.Supp. 1072 (E.D.Wis.1993); *Eisfelder v.*

*Michigan Dep't of Natural Resources,* 847 F.Supp. 78 (W.D.Mich.1993); *Finley v. Giacobbe,* 827 F.Supp. 215 (S.D.N.Y.1993); *Petersen v. University of Wisconsin Bd. of Regents,* 818 F.Supp. 1276 (W.D.Wis.1993); *Ethridge v. State of Alabama,* 847 F.Supp. 903 (M.D.Ala.1993). Two of the three district court opinions agreeing with Zimmerman have already been overruled: *Bledsoe v. Palm Beach Soil and Water Conservation Dist.,* 942 F.Supp. 1439 (S.D.Fla.1996), *rev'd,* 133 F.3d 816 (11th Cir.1998), and *Decker v. University of Houston,* 970 F.Supp. 575 (S.D.Tex.1997). *Decker* is no longer good law, given the Fifth Circuit's contrary opinion in *Holmes.* Thus, *Patterson v. Illinois Dep't of Corrections,* 35 F.Supp.2d 1103 (C.D.Ill.1999) provides the slim reed of support on which *Zimmerman* rests. In addition to these published cases, 4 out of 6 unpublished district court decisions disagree with *Zimmerman.*

ing in the plain meaning of the words that even suggests, let alone mandates, this result. The words themselves are self-evidently broad and inclusive. There are two clauses; each of which, properly construed, includes a proscription on workplace discrimination.

### 1. *First Clause*

The first clause bars discrimination in any of the "programs, services, or activities" of a local governmental entity. The plain and ordinary meaning of "activity" clearly does not exclude hiring or employing workers. Indeed, putting people to work is often the chief "activity" of municipalities. Although Title II does not define these terms, the Rehabilitation Act—with which Congress specified that Title II is to be interpreted consistently—does. *See* 42 U.S.C. § 12133 (providing that "remedies, procedures, and rights" under Title II are the same as those provided in § 794a of the Rehabilitation Act); 42 U.S.C. § 12134 (providing that Title II should be interpreted consistently with regulations under the Rehabilitation Act). Section 508 of the Rehabilitation Act defines "program or activity" as "all of the operations" of the governmental entity. 29 U.S.C. 794(b); *Innovative Health Sys., Inc. v. City of White Plains,* 117 F.3d 37, 44 (2d Cir.1997) (holding that "activity" under Title II has same meaning as "activity" under the Rehabilitation Act and includes all operations of the entity).

Furthermore, the Supreme Court has specifically interpreted the "programs and activities" language in the Rehabilitation Act to include employment, and thus to bar employment discrimination. *Consolidated Rail v. Darrone,* 465 U.S. 624, 631–34, 104 S.Ct. 1248, 79 L.Ed.2d 568 (1984). The language at issue here (Title II) is unquestionably *broader* than that in *Consolidated Rail,* particularly as Title II, unlike the Rehabilitation Act, contains an independent discrimination clause banning all discrimination, in addition to the clause which the Supreme Court construed: the "programs and activities" provision that is common to both statutes. Thus, there can

be no justification for concluding, as the panel does, that Title II is somehow *narrower.* Indeed, applying Title II to discrimination in employment, the Fourth Circuit concluded that the same standard applies to employment discrimination actions brought under Title II and the Rehabilitation Act, because, as Judge Wilkins wrote for the court, in an opinion joined by Judges Wilkinson and Luttig, "the language of the Rehabilitation Act and Title II is substantially the same." *Doe v. University of Maryland Medical Sys. Corp.,* 50 F.3d 1261, 1264 (4th Cir.1995). Moreover, the ADA contains a further provision stating that "nothing in this chapter [the ADA] shall be construed to apply a lesser standard than the standards applied under Title V of the Rehabilitation Act of 1973" or the regulations issued by Federal agencies pursuant to such title. 42 U.S.C. § 12201(a). Where, as here, the language is not only similar, but indeed broader, it must be accorded at a minimum the same meaning—i.e., prohibiting employment discrimination.

The panel attempts to distinguish the Supreme Court decision in *Consolidated Rail* by pointing out that the Rehabilitation Act, unlike the ADA, was limited to those governmental entities receiving federal funds. Thus, according to the panel, the Supreme Court interpreted the Rehabilitation Act to bar employment discrimination because it was possible that federal funds "may well flow into compensation for employees." The panel overlooks the fact, however, that in *Consolidated Rail,* the Supreme Court expressly rejected the argument that Congress was concerned about whether the federal funds were to be used to promote employment, and instead said that the Act was intended to "prohibit[ ] employment discrimination regardless of the purpose of federal financial assistance." 465 U.S. at 632, 104 S.Ct. 1248.

Despite the overwhelming legal authority that the phrase "services, programs, and activities" under Title II is to be inter-

preted consistently with the phrase "programs and activities" under the Rehabilitation Act, and thus to include employment discrimination, the panel arrives at precisely the opposite conclusion. In so doing, the panel rests its determination almost entirely on an erroneous and nonexistent dichotomy between "inputs" and "outputs," asserting that employment is in the former category, while "programs, services, or activities" fall within the latter.

The distinction between "inputs" and "outputs" finds no support whatever in the statutory language (or in the legislative or administrative history). Indeed, the approach was first concocted by a district court in Florida in a decision that has since been reversed in an Eleventh Circuit opinion holding that Title II *does* apply to employment discrimination. *See Bledsoe v. Palm Beach Soil and Water Conservation Dist.*, 942 F.Supp. 1439, 1443 (S.D.Fla.1996), *rev'd*, 133 F.3d 816 (11th Cir.1998).[2] The input-output format adopted by the panel will plunge district courts, and this court as well, into the impossible task of categorizing municipal and state functions and activities into two newly created categories—inputs and outputs—categories heretofore unknown to Congress or the affected administrative agencies, to local or state governments, or to the federal or state courts, with no standards or definitions to guide the entities or parties involved. In any event, it is certainly hard to find "inputs" and "outputs" in the plain meaning of Title II.

In reaching its decision that the plain meaning of Title II excludes discrimination in employment from its coverage, the panel also ignores the A.D.A.'s clear command that Title II be interpreted consistently with the regulations issued under the Rehabilitation Act. 42 U.S.C. § 12134. The particular regulations specified in the text of the statute include specific prohibitions against employment discrimination. The panel refused, however, to consider that

statutory command as evidence that Title II prohibits employment discrimination because, it said, "employment is but one" of the topics covered by the regulations. Slip Op. at 2348. The panel does not, however, offer any reason why that fact should justify ignoring the specific statutory requirement that those particular regulations affecting employment discrimination be made applicable. Similarly, the panel refuses to give effect to the statute's directive in § 12133 that the "remedies, procedures, and *rights*" under Title II shall be identical with those under § 504 of the Rehabilitation Act. The referenced section of the Rehabilitation Act, in turn, provides that the "remedies, procedures, and *rights* [of Title VI of the Civil Rights Act] shall be available to any *employee or applicant for employment* . . . .", 29 U.S.C. 794a (emphasis added). The panel concludes that this plain language does not demonstrate a congressional intent to grant victims of employment discrimination a cause of action, i.e. *rights*, under Title II because that section of the Rehabilitation Act deals only with "procedural" rights. This reasoning completely ignores the fact that the rights addressed are those of "any employee or applicant for employment." In this circumstance, it is irrelevant whether the rights are viewed as "procedural" or "substantive," although it is difficult, in any event, to comprehend why the panel concludes that they are plainly only procedural.

### 2. *Second Clause*

The plain meaning of the second clause of § 12132 even more clearly encompasses employment discrimination—if that is possible. The second clause is separated from the first by a comma followed by "*or* be subjected to discrimination by any such entity." The second and independent clause, like the first, does not contain any language which limits it to an "outward"

---

**2.** The input-output distinction was also adopted by a district court in Texas, *see Decker*, 970 F.Supp. at 578, but that decision was subsequently implicitly overruled by the Fifth

Circuit when it applied Title II to discrimination in employment. *See Holmes v. Texas A & M University*, 145 F.3d 681, 684 (5th Cir. 1998).

focus; nor does its language *in any way* limit the flat and unqualified statutory prohibition against discrimination by any public entity. Certainly, nothing in the statutory language purports to exclude discrimination in employment. To the contrary, the second clause plainly and unequivocally prohibits covered entities from engaging in any discrimination. The panel, however, concludes that the second clause also applies only to discrimination in the provision of "services, programs, and activities" and cites *Crowder v. Kitagawa,* 81 F.3d 1480 (9th Cir.1996), for support. *Crowder* in no way supports the panel's opinion; indeed, it is pertinent only to the extent that it emphasizes the "or" that separates the two independent clauses, and the substantive differences in congressional intent with respect to these clauses. The only issue in *Crowder* was whether discrimination with respect to "services, programs, and activities" need be direct and intentional, and the court said, "no," a holding of no relevance here.

The proper construction of the second clause was afforded it by both the Eleventh and the Second Circuits. In *Bledsoe,* the Eleventh Circuit wrote:

> As the Second Circuit found in *Innovative Health Systems, Inc. v. City of White Plains,* 117 F.3d 37, 44–45 (2d Cir.1997), "the language of Title II's antidiscrimination provision does not limit the ADA's coverage to conduct that occurs in the 'programs, services, or activities' of [a public entity]. Rather, it is a catch-all phrase that prohibits all discrimination by a public entity, regardless of the context, . . . ." Accordingly, employment coverage is clear from the language and structure of Title II.

*Bledsoe,* 133 F.3d at 821. To conclude that the panel clearly erred in holding that the plain meaning of Title II is that it is inapplicable to discrimination in employment, we need only look to what the Second and Eleventh Circuits have unequivocally stated regarding the Title's second and independent clause. "It is a catch-all phrase that prohibits all discrimination by

a public entity, regardless of the context. . . ." *Id.*

The panel supports its niggardly construction of the second clause by suggesting that Title II's definition of "qualified individual with a disability" somehow excludes coverage for employment discrimination. Its argument essentially is that the definition of that term in 42 U.S.C. § 12131(2) necessarily limits Title II's coverage to "services, programs or activities." Slip Op. at 2338–39. There are two obvious problems with this argument. First, it would read the second clause of § 12132— "or be subjected to discrimination"—entirely out of the statute and render it redundant. Second, as noted above, both Congress and the Supreme Court have already made it absolutely clear that programs and activities as used in the Rehabilitation Act—with which the ADA is to be interpreted consistently, *see Bay Area Addiction Research and Treatment, Inc. v. City of Antioch,* 179 F.3d 725, 730 (9th Cir.1999), *does* cover employment. At most, the definition of a disabled person in the definition section of Title II raises a question, or creates an ambiguity, regarding the meaning of Title II's language. It does not in any way "plainly" exclude employment discrimination from the purview of a statute that, on its face, clearly covers it.

As the Eleventh Circuit concluded in *Bledsoe:* "Accordingly, employment coverage is clear from the language and structure of Title II." *Id.* In sum, the plain language of Title II prohibiting "discrimination," coupled with the plain language of other parts of Title II that incorporate by reference parts of the Rehabilitation Act, demonstrates that Congress unambiguously intended to include, and did include, employment discrimination within the scope of Title II. Such coverage is provided for in the plain language of both the first and the second clauses of § 12132, as indeed are all forms of discrimination by public entities. Thus, the panel's conclusion that the plain meaning of the statute

compels the opposite result—that Title II *excludes* employment discrimination from its coverage—is to misread the statutory language completely.

### 3. *Structure*

The panel states that Title I of the ADA prohibits discrimination in employment, and then treats Titles I and II as necessarily mutually exclusive, although other circuits have consistently construed them as overlapping. *See e.g., Bledsoe,* 133 F.3d at 820. In insisting on a necessary mutual exclusivity, the panel ignores the plain statutory language of Title II and relies on an entirely unsupportable theory that applying Title II to employment discrimination would render Title I superfluous. In this respect as well, the panel clearly errs. There are differences in the scope of coverage of employment discrimination under Title I and Title II (Title I covers employers with 15 or more employees, while Title II covers all public employers, regardless of size), the two Titles evolved from different civil rights laws (Title I is modeled on Title VII of the 1964 Civil Rights Act, while Title II is modeled on the Rehabilitation Act and Title VI of the 1964 Civil Rights Act), and there is a difference in the forms of relief (compensatory and punitive damages are available under Title I, but may not be under Title II), and the procedures to be followed (administrative exhaustion is required under Title I but not under Title II). Thus, the provisions of the two Titles are not coextensive; although both apply to employment, neither is redundant.

Congress's decision to provide two approaches to remedying discrimination in employment in one complex disability statute has caused some to question the wisdom of its policy and its rationale. It is, of course, not our function to do so. *See United States v. Burdeau,* 180 F.3d 1091, 1092–93 (9th Cir.1999) (Kozinski, J., dissenting from the order rejecting the suggestion for rehearing en banc). In any event, if the fact that two Titles appear to address the same general area of discrimination raises some doubt about the meaning of one or both Titles, the statute is, at most, ambiguous, and it is the unequivocal legislative history to which we must turn.

Before doing so, I would add that the panel acted properly in examining the statute's structure and the statute as a whole, as well as the statutory objectives and policies, *if* it believed that its effort to determine Title II's plain meaning would benefit from such an examination. See *Northwest Forest Resource Council v. Glickman,* 82 F.3d 825, 830 (9th Cir.1996). The problem here, in part, is that its examination led it to the wrong result. The statutory structure does not support the panel's conclusion; nor does the statute as a whole. A careful examination merely tells us that the statute contains overlapping Titles. More significantly, the statute's objectives and policies not only do not support the holding the panel reaches, but compel the opposite result. Nowhere in its opinion does the panel suggest, nor could it, that any policy or objective of the ADA argues for limiting any of its provisions, including Title II, so as to exclude employment discrimination. To the contrary, the policies and objectives of the act were to eradicate all discrimination against the disabled by public entities in every area, including employment discrimination. It is a generous rather than a stingy reading of Title II that furthers the ADA's policies and objectives.

### 4. *Summary*

If anything is clear about this case, it is that the plain meaning of the statute is not what the panel says it is. No matter how apparent it may be that particular statutory language provides "X", a court can determine, if it chooses, that the statute does not provide "X"; and indeed, that "X" has nothing whatever to do with it. It can do so by holding that the statutory language plainly says what it plainly does not. A court can announce that the word "dog" plainly means "cat" if a panel so chooses, and a majority of eligible active judges then elects not to take the case en banc.

That is what happened here: Congress, by plain language (or "wording" as the panel insists on putting it) provided disabled persons with a Title II remedy for discrimination in public employment. The panel then held that the plain meaning of the statute is that it did not, and a majority of our active judges has now seen fit to allow the panel's erroneous pronouncement to stand.

What the panel and our court have done is of course not unique. Courts have in the past chosen on various occasions to read statutes as having precisely the opposite meaning from that dictated by the statutes' plain language. Even the Constitution has been the victim of this odd interpretive technique. The most prominent example is the perverse interpretation given to the Eleventh Amendment in *Hans v. Louisiana,* 134 U.S. 1, 14, 10 S.Ct. 504, 33 L.Ed. 842 (1890). There, the Court read the plain language of the Amendment, which stated that the federal courts lack jurisdiction to consider suits brought against a state by *"citizens of another state"* as having almost precisely the opposite meaning: that federal courts lack jurisdiction over suits brought against a state by *citizens of the same state.* The Court rejected the plaintiff's appeal to the plain language of the amendment as "an attempt to strain the constitution and the law to a construction never imagined or dreamed of." Justice Bradley, writing for the majority, declined even to give any policy justifications for the decision to ignore what he called "the letter" of the law, saying "it is enough for us to declare" a contrary rule. *Id.* at 18–19, 10 S.Ct. at 508. This ostensibly "plain" meaning was reaffirmed by a divided Supreme Court in 1987. *See Welch v. Texas Dept. of Highways and Public Transportation,* 483 U.S. 468, 492, 107 S.Ct. 2941, 97 L.Ed.2d 389 (1987) (declining to overrule Hans on the basis of stare decisis). Today, this contrarian "construction" of the Eleventh Amendment's plain language lies at the heart of federalism's recent resurgence. *See Alden v. Maine,* —— U.S. ——, ——, 119 S.Ct. 2240, 2252, —— L.Ed.2d ——

(1999) (following *Hans* in declining to "adher[e] to the mere letter" of the Eleventh Amendment).

*Hans* and other cases involving judicial failures to respect the plain meaning of words contained in the Constitution or in statutes do not, of course, excuse what our court does today. To the contrary, this latest example should cause great concern to those who volubly proclaim their fear that federal judges do not demonstrate sufficient respect for the decisions of other branches of government or for the Constitution's framers. Whether a congressionally granted right is invalidated under the guise of statutory construction or by reliance on a Constitutional doctrine conjured up by the judiciary, the result is the same; the will of the people has been improperly frustrated.

### B. *Legislative History*

The panel is compelled to rely on "plain language" that is nowhere to be found in the statute because the legislative history of Title II overwhelmingly confirms that Congress did indeed intend to ban employment discrimination in Title II. If the statute were ambiguous—and that is the best that the panel could legitimately hope to prove by its wording and structure arguments—the legislative history would be dispositive. The House Judiciary Committee Report states that "in the area of employment, title II incorporates" the regulations under the Rehabilitation Act. H.R.Rep. No. 101–485(III) (1990). The House Report also states that Title II is intended to prohibit forms of discrimination "identical" to those contained in Title I—which deals exclusively with employment discrimination—and that it is to "work in the same manner as section 504" of the Rehabilitation Act, which also prohibits employment discrimination. *Id.* at 84. Likewise, the Senate Labor Committee Report states that employment discrimination is prohibited by Title II: "The existence of non-disability related factors

in the rejection decisions does not immunize employers" making adverse hiring determinations. S.Rep. No. 116, 101st Cong., 1st Sess., at 45 (1989). As the Eleventh Circuit observed in *Bledsoe,* "[e]xtensive legislative commentary regarding the applicability of Title II to employment discrimination ... is so pervasive as to belie any contention that Title II does not apply to employment actions." 133 F.3d at 821.

The panel's opinion never even acknowledges the existence of these authoritative Committee Reports and the clear evidence of congressional intent. The panel insists instead that the language and structure of the law unambiguously makes clear that Title II excludes "employment" discrimination from its scope. The reason the panel does not go beyond this point is evident. Unless the panel can base its decision on its argument that the plain language of the statute excludes employment discrimination from the coverage afforded by Title II, the argument is over. If the ADA is "ambiguous," then in light of the legislative history, Title II *must* be held to cover employment discrimination.

### C. *Chevron Deference*

The panel is compelled to rely exclusively on its argument that Title II plainly and unambiguously excludes discrimination in employment for another reason as well. If the statute does not by its plain language compel exclusion of employment discrimination, and it is instead found to be ambiguous, *Chevron* deference also requires that we hold that Title II does indeed prohibit employment discrimination. Congress delegated enforcement of Title II to the Department of Justice, and directed it to promulgate regulations consistent with the regulations implementing the Rehabilitation Act. 42 U.S.C. § 12134. Moreover, as the House Judiciary Committee Report states, the Department of Justice was directed to specify the interpretation of the forms of prohibited discrimination where ambiguity existed and interpretation was required.

Unlike the other Titles in this Act, title II does not list all of the forms of discrimination that the title is intended to prohibit. Thus, the purpose of this section is to direct the Attorney General to issue regulations setting forth the forms of discrimination prohibited. The Committee intends that the regulations under Title II incorporate interpretations of the term discrimination set forth in Titles I and III of the ADA to the extent that they do not conflict with section 504 regulations.

H.R.Rep. No. 485(III), 101st Cong., 2d Sess., at 52 (1989). This language was used in both the Judiciary and Education Committee Reports.

The Department of Justice, acting pursuant to this clear congressional command, issued regulations that straightforwardly apply Title II to employment discrimination. 28 C.F.R. pt. 35, App. A ("Title II of the ADA applies to all activities of public entities, including their employment practices."); 28 C.F.R. § 35.140(a) ("No qualified individual with a disability shall, on the basis of disability, be subjected to discrimination in employment under any service, program, or activity conducted by a public entity."). If it is not plain from the language, structure, and legislative history that Congress intended to apply Title II to public employment, then, at the very least, it is uncertain whether or not it intended to do so. In such cases, the Department of Justice was authorized to fill in the gaps. The Department's interpretation is neither arbitrary nor manifestly contrary to the statute. Instead, these regulations faithfully adhere to Congress's intent, are well within the agency's discretion, and are thus controlling.

### D. *Conclusion*

The plain language of the statute conclusively demonstrates that, as every other circuit to have considered the issue has concluded, Title II applies to employment discrimination. Both major clauses of the provision independently proscribe such discrimination. At the very least, the statute is ambiguous, and in that event,

both the unequivocal legislative history and the uniform Department of Justice's regulatory interpretations, to which we must give deference, compel the conclusion that Title II applies to employment discrimination. Unquestionably, that is what Congress intended, and that is what the other circuit courts have readily understood. Here, the panel made a serious error of law in a case of great significance, where uniformity is necessary. Its holding that the plain language of Title II *excludes* employment discrimination is simply contrary to the applicable rules and precepts of statutory construction, as well as to all prior caselaw in the circuit courts. For these reasons, I dissent.