**Lonnie J. HUISENGA, Relator,**

**v.**

**OPUS CORPORATION and Chubb Group Insurance Company and Lund Martin Construction Co. and CNA Insurance Company, Respondents,**

**and**

**Minnesota Department of Human Services, Carpenter & Joiners Welfare Fund, Intervenors, Respondents.**

**No. C3–92–807.**

Supreme Court of Minnesota.

Dec. 31, 1992.

Rehearing Denied Feb. 4, 1993.

Carter J. Bergen, St. Paul, for appellant.

Thomas P. Kieselbach, Minneapolis, for Opus Corp., et al.

Gary M. Hagstrom, Minneapolis, for Lund Martin Const. Co., et al.

Laurasue Schlatter, St. Paul, for MN Dept. of Human Services.

Kurt F. Walther, St. Paul, for Carpenters & Joiners Welfare Fund.

TOMLJANOVICH, Justice.

We are asked to revisit our decision in *Jewison v. Frerichs*, 434 N.W.2d 259 (Minn.1989). In *Jewison*, we held that, in some situations, if a job applicant or an employee makes a false representation regarding physical condition or health, workers' compensation benefits will be barred. Today we address the question of whether an employer may avoid paying benefits when a job applicant or employee has made a false representation regarding health or physical condition in response to a question posed by the employer which requests health and medical information unrelated to the tasks of the job and is thus prohibited by the Minnesota Human Rights Act, Minn.Stat. § 363.01, *et seq.* (1990) ["MHRA"]. We hold that when an employer asks such questions of an employee or job applicant, it cannot rely upon the *Jewison* defense in subsequent workers' compensation proceedings. We reverse the WCCA and remand to the compensation judge to order benefits.

On April 19, 1986, while employed as a carpenter by Opus Corporation, Lonnie Huisenga injured his lower back. Because of this injury, he underwent a lumbar decompression on November 7, 1986, for removal of a herniated disc and release of subarticular stenosis. After the surgery, he had behind-the-knee tightness and a sore back. He was rated as having a 9 percent permanent partial disability of the whole body.

Huisenga returned to work at Opus in March 1987. At first, he did only light-duty work, but in a month or so, he was back to full duties. After returning to full time work, he was more careful about how he lifted and did not lift large pieces of sheetrock by himself. He left Opus in 1987 to enter an alcohol treatment program.

From June 1988 until the spring of 1989, Huisenga worked for two construction companies, doing lighter work than he had at Opus. In May 1989, Huisenga inquired of Lund Martin Construction Company to see if it might have work for him. He was told that a carpentry job was available that he could begin the next day. When Huisenga reported to work, he was given a form entitled "Pre–Employment Health Questionnaire" to complete. The form sought information about, among other things, whether Huisenga had ever had a back injury, whether he had ever received workers' compensation benefits, whether he had ever made a workers' compensation claim for a hernia, a slipped disc, a strain or sprain of his back or shoulder, and whether any former workers' compensation claim established a medical permanency. Huisenga answered "no" to each of these questions.

Because of work activities in February of 1991, Huisenga again sustained an injury to his back. He filed a workers' compensation claim. The compensation judge found that his prior employment had contributed to 65 percent of his temporary disability, medical and hospital expenses, and need for rehabilitation. He attributed the remaining 35 percent of the expenses to Lund Martin. The compensation judge did not award Huisenga benefits for Lund Martin's share, ruling that it did not need to pay them because Huisenga had not responded truthfully to the questions on the medical questionnaire. The WCCA affirmed.

I.

In 1989, this court handed down *Jewison v. Frerichs Construction*, 434 N.W.2d 259 (Minn.1989). We held that a

false representation as to a physical condition or state of health made by an employee precludes the awarding of workers' compensation benefits if it is shown that:

1. The employee knowingly and willfully made a false representation as to his physical condition;

2. The employer substantially and justifiably relied on the false representation in the hiring of an employee; and

3. A causal connection exists between the false representation and the injury.

*Id.* at 261. We placed the burden of proof on the employer to prove each element. *Id.* Fleshing out the concept of justifiable reliance in this context, we noted:

An employer must provide a *justifiable reason* for not hiring a particular applicant. Except when based on *a bona fide occupational qualification,* it is unfair employment practice for an employer to discriminate against a person with respect to hiring because of a disability. Minn.Stat. § 363.03, subd. 1(2)(c) (1986).

*Id.* at 261 n. 1 (emphasis added).[1] Thus, in *Jewison,* we clearly contemplated that the Minnesota Human Rights Act be taken into account when a compensation judge decides if an employer may avail itself of the defense.

The MHRA prohibits an employer from making inquiries about an employee's disabilities before a job offer has been made:

[I]t is an unfair employment practice * * * for an employer * * * before a person is employed * * * to require or request the person to furnish information that pertains to * * * disability * * * [.]

Minn.Stat. § 363.03, subd. 1(4)(a) (1990).

The MHRA also limits the inquiries which may be made even after a job offer has been made:

(8) It is not an unfair employment practice for an employer * * *:

(i) to require or request a person to undergo physical examination, which may include a medical history, for the purpose of determining the person's capability to perform available employment, provided

(a) that an offer of employment has been made on condition that the person meets the physical or mental requirements of the job * * *;

(b) that the examination tests only for *essential job-related abilities;* and

(c) that the examination except for examinations authorized under chapter 176 is required of all persons conditionally offered employment for the same position regardless of disability * * * [.]

Minn.Stat. § 363.02, subd. 1(8)(i) (1990) (emphasis added).

This court has not had an opportunity to interpret the MHRA's BFOQ provisions. In interpreting the MHRA, however, this court will usually follow the lead of the United States Supreme Court's interpretations of federal anti-discrimination statutes such as Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, *et seq. Sigurdson v. Isanti County,* 386 N.W.2d 715, 719 (Minn. 1986).

The most recent United States Supreme Court case to discuss the concept of a BFOQ is *International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW v. Johnson Controls, Inc.,* — U.S. —, 111 S.Ct. 1196, 113 L.Ed.2d 158 (1991). In *Johnson Controls,* the question before the Court was whether a gender-based fetal protection policy was valid under the BFOQ provisions of Title VII.

Title VII's BFOQ defense provides that an employer may discriminate on the basis of "religion, sex, or national origin in those certain instances where religion, sex, or national origin is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise * * *." 42 U.S.C. § 2000e–2(e)(1). In construing this section, the Court noted that "[t]he BFOQ defense

1. In this opinion, we will adopt the vernacular of the employment discrimination practitioner and refer to a bona fide occupational qualification as a BFOQ.

is written narrowly, and this Court has read it narrowly." At ——, 111 S.Ct. at 1204 (citing as examples *Dothard v. Rawlinson*, 433 U.S. 321, 332–37, 97 S.Ct. 2720, 2728–30, 53 L.Ed.2d 786 (1977) and *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 122–25, 105 S.Ct. 613, 622–23, 83 L.Ed.2d 523 (1985)). The Court noted that it had also interpreted the BFOQ language of the Age Discrimination in Employment Act, 29 U.S.C. § 623(f)(1), which tracks the BFOQ provision in Title VII, just as narrowly. *Id.* (citing *Western Air Lines, Inc. v. Criswell*, 472 U.S. 400, 105 S.Ct. 2743, 86 L.Ed.2d 321 (1985)). Furthermore, the Court emphasized that in order to qualify as a BFOQ, a job requirement must relate to the "essence" of a job or the "central mission of the employer's business" and be more than merely "job-related." *Id.* —— U.S. at ——, 111 S.Ct. at 1205.

Applying this analysis to the company's policy, which required certain women of childbearing age to provide evidence that they were infertile in order to hold certain positions involving potential exposure to a high amount of lead, the Court concluded that this gender-based rule failed under Title VII because the gender-based distinction was not reasonably necessary to the running of Johnson Controls' business. *Id.* at ——–——, 111 S.Ct. at 1207–08.

■ In some circumstances, an employer may justify otherwise discriminatory actions because of legitimate safety concerns. In *Johnson Controls*, the Court noted that danger to the applicant or employee does not justify discrimination. *Id.* at ——, 111 S.Ct. at 1205 (citing *Dothard*, 433 U.S. at 335, 97 S.Ct. at 2729–30). The Court also noted that safety of third parties may, in some instances, justify otherwise discriminatory behavior. *Id. See Criswell*, 472 U.S. at 420–21, 105 S.Ct. at 2754–55 (safety concerns justified discriminating against flight engineers over 60); *Dothard*, 433 U.S. at 335–37, 97 S.Ct. at 2729–30 (prison housing male inmates allowed to hire only male guards because of risk that violence would erupt if a guard was female). In *Johnson Controls*, the Court emphasized that it had only allowed the BFOQ defense to be based on the safety of third parties "indispensable to the particular business at issue." —— U.S. at ——, 111 S.Ct. at 1205.[2]

■ Applying these Supreme Court precedents, we believe the Pre–Employment Questionnaire was not designed to ferret out only those disabilities which would hamper the applicant from doing the essential functions of the job. One inquiry made on the questionnaire was whether the employee had ever had a back injury. We believe this inquiry was too broad; clearly it was not calculated to discern only those back injuries which would impact an employee's ability to perform the tasks of a carpenter. Having a functional back is necessary in order to perform the work of a carpenter—having a back that has never been injured is not. We also believe that it would be unsuitable for us to declare an arbitrary time period about which employers may ask questions. The critical inquiry is whether the inquiries are tailored to test the employee's present abilities or disabilities, not past health history regardless of remoteness.

■ Lund Martin's inquiries regarding prior workers' compensation claims of an employee or applicant also stray from the mark. We do not see how asking if an employee or applicant has ever received workers' compensation benefits can survive the requirements of the MHRA. A person could have been previously injured in the workplace in a fashion completely irrelevant to the requirements for the job in question. Yet the questionnaire clearly asks an applicant or employee to divulge information regarding not only the claims which go to the essence of the job, but also those which do not. Probing into the health history and disabilities of an applicant or employee in this fashion is not

---

**2.** Unlike the MHRA, Title VII does not ban discrimination in employment based upon disability. That task will be taken up by the Americans with Disabilities Act of 1990, 42 § 12101, *et seq.* Because it has only recently become effective, there is no case law interpreting it. However, the Rehabilitation Act of 1975, 29 U.S.C. § 701, *et seq.*, prohibits some federal contractors from discriminating on the basis of disabilities.

permitted under the MHRA unless the inquiries are tailored to the requirements of the job in question. The general nature of the question indicates that no such tailoring effort was made here.

■ The questionnaire also asked if any former worker's compensation claim established a medical permanency. Again this inquiry goes too far. An employee or applicant could have suffered a permanent medical disability from another job which would not affect his or her ability to do the carpentry work at issue in this case. This inquiry is not restricted to only those permanent disabilities essential to the job and is thus improper under the MHRA.

■ The questionnaire also asked if the employee or applicant had ever made a workers' compensation claim for hernia, slipped disc, or a sprain of the back or shoulder. This question comes closer to complying with the requirements of the MHRA. The injuries listed are the exact types of injuries which might prevent a carpenter from adequately performing the tasks of carpentry. Again, however, the fact that the question probes into the entire health history of the employee or applicant causes the question to run afoul of the requirements of the MHRA. It seems to us that a workers' compensation claim for a strain of the shoulder in the distant past is not relevant to the present ability of an employee or applicant to do the job.

For the above reasons, we conclude that Lund Martin's questions violated the MHRA. The MHRA could not be more clear in stating that questions regarding health and disability may only be asked if they test essential job-related abilities. These did not. Furthermore, we believe that overreaching invites deceit. If an employer asks only questions tailored to the requirements of a specific job, we believe it is more likely that it will get honest responses. Even if we did not believe this to be so, we may not and will not ignore the obligations the MHRA has placed on employers when they inquire into the health history and disabilities of job applicants and employees.

■ When making inquiries of job applicants or employees, employers may do so only in methods which comply with the provisions of the MHRA. If they stray from the mandates and prohibitions of the MHRA, their reliance on the resulting information is from a "poisoned tree"—to borrow a term from the criminal law—and hence not "justifiable" within the meaning of the *Jewison* defense. We hold that in workers' compensation litigation, if the employer raises the *Jewison* defense, the employee may raise the issue of whether the questions asked regarding disabilities complied with the requirement that they only inquire into job-related qualifications. Upon a showing that such questions were asked by the employer, the burden returns to the employer to demonstrate how the inquiries were job-related or necessary to protect the safety of third-parties indispensable to the employer's business.[3] If an employer cannot justify the inquiries, it may not avoid liability under *Jewison*. Because Lund Martin's questions were not adequately tailored, it cannot avail itself of the *Jewison* defense in this case; thus it must pay the portion of workers' compensation benefits attributable to it. We reverse and remand to the compensation judge for proceedings consistent with this opinion.

Reversed.

COYNE, J., took no part in the consideration or decision of this case.

---

**3.** Today's holding rests on the assumption that the workers' compensation courts have the ability to make decisions about bona fide occupational qualifications. We are not of course giving them power to order relief under the MHRA if an employer has questions, as in this case, which are not adequately job-related. Thus the inquiry is more a factual than a legal one. Essentially, the compensation judge will have to ask, "Has the employer demonstrated that it was necessary to ask this question in order to find an applicant who will be able to do the specific job in question?" We do not believe that this inquiry goes beyond the valid jurisdiction of the workers' compensation courts.