Anthony DOWNS, Plaintiff,

v.

**MASSACHUSETTS BAY
TRANSPORTATION AUTHORITY,
Defendant.**

**No. CIV. A. 95–11920–MEL.**

United States District Court,
D. Massachusetts.

July 6, 1998.

Walter Korzeniowski, Law Office of Walter J. Korzeniowski, South Easton, MA, for Plaintiff.

Walter M. Foster, Walter M. Foster, Asst. General Counsel, Boston, MA, for Defendant.

LASKER, District Judge.

Anthony Downs sues his former employer, the Massachusetts Bay Transportation Authority ("MBTA"), for wrongful termination in the wake of having been fired after the MBTA learned he had given false responses to two questions asked during a pre-employment medical examination. The MBTA discovered these false answers in the course of investigating a workers' compensation claim Downs filed nearly two years after being hired by the MBTA.

Downs maintains that the Americans with Disabilities Act ("ADA") and the Rehabilitation Act prohibit employers from asking questions of the type he answered falsely, and that the MBTA violated confidentiality requirements imposed by these statutes in making his responses to these questions available to its workers' compensation claims representative and to disciplinary authorities. Accordingly, Downs argues that his termination violated the ADA and the Rehabilitation Act, as well as M.G.L. ch. 152 § 75B(2), which forbids discrimination based on the exercise of rights provided by state workers' compensation laws.

Both Downs and the MBTA move pursuant to Fed.R.Civ.P. 56 for entry of summary judgment.

## I.

Downs replied to an MBTA newspaper advertisement soliciting applicants for positions as part-time bus operators in 1989. Two years later, he was invited to participate in the MBTA's two-part preliminary screening process. In March of 1992, he took and passed a driver's test, and in May of 1992 he completed a personality inventory in a manner the MBTA found satisfactory.

After Downs passed these two pre-employment examinations, he was asked to come to the MBTA office on May 11, 1992 so that his employment application could be processed. When Downs arrived that day and expressed his continued interest in the part-time bus driver position, he was told that he "would probably get the job" if he passed a physical and drug screen. He was given a form entitled "Acceptance of Conditional Offer of Employment" and an application to complete. Downs's signature on the Conditional Offer form indicated his willingness to accept the MBTA's "conditional offer of employment," and his understanding that his "conditional employment with the MBTA" was contingent upon a criminal background check.

Upon completion of these forms, Downs was sent to the MBTA's medical clinic for a physical examination. There, he was instructed to fill out a medical history form which asked, in relevant part, whether he had "ever received workers' compensation" or "ever had joint pains." Downs answered both questions in the negative despite the fact that he had received workers' compensation on several prior occasions, twice for injuries to his elbow. Downs explained in deposition testimony that he gave these answers because of his understanding that "it was against the law to ask these questions [and he] didn't have to answer them." Downs then underwent a physical examination and drug screening.

Downs was notified soon thereafter that he had passed the physical examination and drug screening, and was asked to provide the personnel office with additional materials (including a parking ticket screening form and a Commercial Drivers License ("CDL") permit form). Then, on May 14th, Downs took and passed a multiple-choice examination to receive a CDL Class B permit that licensed him to drive a bus. At last, Downs reached the final stage of the hiring process—an interview with a representative of the MBTA Transportation Department. At the end of the interview, Downs was offered and accept-

ed a position as a part-time bus operator. Downs began work on May 18, 1992.

In early January of 1994, Downs filed an injury report indicating that he had developed a tendon problem in his right elbow that was aggravated by driving. On January 13th, he underwent surgery on his elbow, and soon thereafter filed a claim for workers' compensation benefits. In the course of evaluating this claim, an MBTA representative learned of Downs's prior elbow injury and his workers' compensation claims, and discovered that Downs had responded falsely to several questions on the medical history form he filled out during his pre-employment physical examination. The claims representative notified an MBTA supervisor of her discovery, and the MBTA brought disciplinary charges against Downs for falsifying information on his employment application. A conference regarding the charges was conducted on March 28, 1994. Downs declined to respond to the charges, and accordingly was suspended for thirty days pending discharge. Downs was formally notified of his discharge by letter of April 19, 1994.

Following his dismissal, Downs sought unemployment benefits. Although benefits were initially denied based on a finding that Downs was discharged "for a knowing violation of a reasonable and uniformly enforced rule," the Board of Review held that Downs's false answers did not preclude his receiving benefits. The Board explained that state law prohibited the MBTA from asking the questions Downs answered untruthfully, and concluded that "since the employer asked unlawful questions, the claimant's failure to answer them truthfully cannot be deemed to be deliberate misconduct ... or to be a knowing violation of a reasonable rule or policy of the employer."

Downs filed a complaint against the MBTA with the Department of Justice on September 30, 1994 pursuant to Title II of the ADA. The complaint was referred to the EEOC, which dismissed it on June 28, 1996 stating that Downs was "not a qualified individual with a disability as defined by the ADA" and issued Downs a right-to-sue notice. In the interim, Downs filed this suit on August 25, 1995.

II.

Downs moves pursuant to Fed.R.Civ.P. 56(a) for entry of summary judgment holding that the MBTA has violated Title II of the ADA and § 504 of the Rehabilitation Act by terminating him because he had a record of, and because it regarded him as having, an impairment; by conducting a medical examination and making medical inquiries without having made a "conditional offer of employment" within the meaning of the statutes; by making prohibited medical inquiries; and by failing to keep his medical records confidential. He also claims he is entitled to summary judgment that the MBTA violated M.G.L. ch. 152 § 75B(2) by discriminating against him for having asserted rights afforded by the state workers' compensation statute.

Downs claims that the MBTA is covered both by Title II of the ADA, as it is a "public entity," which is defined to include "any department, agency, special purpose district, or other instrumentality of a state or States or local government," 42 U.S.C. § 12131(1)(B), and by the Rehabilitation Act, as it is a "program or activity receiving Federal financial assistance," 29 U.S.C. § 794. He contends that the MBTA has violated the prohibition these statutes impose on discriminating against qualified individuals with disabilities.

Downs maintains that undisputed material facts establish each element of his discriminatory discharge claim, that is, (1) that he was disabled, (2) that he could perform the essential functions of his job with or without reasonable accommodation, and (3) that he was fired because of his disability. Downs claims that he was disabled within the meaning of the ADA and the Rehabilitation Act both because he has a record of having a physical impairment "that substantially limits one or more of [his] major life activities," and because the MBTA regarded him as having such an impairment. 42 U.S.C. § 12102(2); 29 U.S.C. § 706(8)(B). Downs argues that, despite his undisputed ability to perform the physical requirements of his job, the MBTA terminated him because of his record of having had an impaired elbow, which it discover-

ed through his workers' compensation records, and because it falsely believed that his condition might endanger public safety and increase its workers' compensation costs.

Downs further contends that he is entitled to summary judgment that the MBTA violated the ADA and the Rehabilitation Act by conducting a medical examination and making medical inquiries prior to having made a conditional offer of employment, as required by these statutes, and by making medical and disability inquiries that are impermissible under the statutes. 42 U.S.C. § 12112(d)(3); 28 C.F.R. § 42.513(c). Downs also alleges he is entitled to summary judgment as to the MBTA having violated the ADA by failing to maintain the confidentiality of his medical records.

Finally, Downs moves for summary judgment on his claim that the MBTA violated the state workers' compensation statute by firing him because of his prior workers' compensation claims, and his pursuit of a claim while working at the MBTA. M.G.L. ch. 152 § 75B(2)("[N]o employer . . . shall discharge . . . an employee because the employee has exercised a right afforded by this chapter.")

The MBTA seeks summary judgment on several grounds. It argues first that Downs's ADA claims lack merit because employment discrimination claims are not actionable under Title II of the ADA, and because Title I of the ADA was not yet in effect when the alleged discrimination occurred, that is, when the pre-employment medical examination was conducted. The MBTA further contends that, even if Downs's cause of action arose after the effective date of Title I of the ADA, he failed to file a timely charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") as is required under Title I. The MBTA also maintains that Downs's ADA and Rehabilitation Act claims are barred by the applicable three-year limitations period.

The MBTA also claims entitlement to summary judgment on the grounds that Downs has failed to establish the elements of a prima facie claim of disability discrimination. In particular, it contends that Downs has not shown either that he has a disability, or that he is a qualified individual with a disability

within the meaning of the ADA and the Rehabilitation Act. The MBTA argues that Downs's misconduct in giving false answers to the contested medical inquiries prevents him from being "qualified" to perform his job, and that this not only prevents Downs from pursuing his discriminatory discharge claims, but also deprives him of standing to challenge the MBTA's medical inquiries.

The MBTA next asserts that its medical inquiries were made following a conditional offer of employment, and that the inquiries were permissible at that stage of the hiring process. The MBTA also states that it did not violate any confidentiality requirement since Downs had authorized it to release his medical history form to its workers' compensation claims representative. Finally, the MBTA denies that it violated the state workers' compensation statute, arguing that it fired Downs "because" of his misconduct rather than "because" of his exercise of his rights to workers' compensation.

### III.

The parties' cross-motions for summary judgment raise both procedural and substantive questions. It is appropriate first to consider the issues relevant to Downs's right to assert his various claims, and then to address the merits of the claims.

*Coverage of Title II of the ADA*

■ Two of the MBTA's arguments—that Downs's claims are not actionable because the challenged medical inquiries occurred before the effective date of Title I, and that Downs is precluded from pursuing his claims because he failed to comply with Title I's procedural requirements—hinge on whether Title II of the ADA is applicable to employment discrimination claims. Title II became effective January 26, 1992, and Title I went into effect six months later. The procedural requirements of these sections of the ADA differ in that only Title I requires exhaustion of administrative remedies. If Downs's claims are covered by Title II, then the MBTA's Title I-based defenses fail.

The MBTA contends that Title II, which is styled "Public Services," applies only to the services and programs offered by public enti-

ties, and does not encompass the employment practices of such entities. Those practices, the MBTA maintains, can be addressed only under Title I, which is directly concerned with employment discrimination.

The vast majority of courts which have considered this question have concluded that the scope which the MBTA would accord Title II is too limited. In *Bledsoe v. Palm Beach County Soil. & Water Conservation Dist.,* 133 F.3d 816 (11th Cir.1998), the court held that "Title II of the ADA does encompass employment discrimination." 133 F.3d at 820–825 (reversing a district court decision on which the MBTA relied in its brief). *See also, e.g., Dominguez v. City of Council Bluffs,* 974 F.Supp. 732, 736–37 (S.D.Iowa 1997)(collecting cases); *Bracciale v. City of Philadelphia,* No. 97–2464, 1997 WL 672263 (E.D.Pa. Oct.29, 1997); *Davoll v. Webb,* 943 F.Supp. 1289, 1296–1298 (D.Colo.1996). *But see Iskander v. Rodeo Sanitary Dist.,* 1995 WL 56578 (N.D.Cal. Feb.7, 1995), *aff'd on other grounds,* 121 F.3d 715 (9th Cir.1997). Other courts have applied Title II to employment discrimination claims without question. *Holmes v. Texas A & M University,* 138 F.3d 168 (5th Cir.1998); *Doe v. University of Maryland Med. Sys. Corp.,* 50 F.3d 1261, 1264–65 (4th Cir.1995); *Hernandez v. City of Hartford,* 959 F.Supp. 125 (D.Conn.1997).

Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or *be subjected to discrimination by any such entity.*" 42 U.S.C. § 12132 (emphasis added). The MBTA focuses exclusively on the access to the "services, programs or activities" of public entities guaranteed by the first prong of this section, and disregards the general prohibition on discrimination provided by the second prong.

That this general prohibition encompasses employment discrimination is apparent from Title II's reference to the Rehabilitation Act standards and from the Department of Justice's implementing regulations.[1] Title II directs the Attorney General to promulgate regulations that are consistent with those implementing 29 U.S.C. § 794 (§ 504 of the Rehabilitation Act). 42 U.S.C. § 12134(a), (b). It is significant that Congress contemplated a coordinated interpretation of Title II and § 504 of the Rehabilitation Act because language in § 504 very similar to that of 42 U.S.C. § 12132 (and similarly devoid of express reference to employment) had long been understood to prohibit employment discrimination. *See Consolidated Rail v. Darrone,* 465 U.S. 624, 632, 104 S.Ct. 1248, 79 L.Ed.2d 568 (1984)("[I]t is unquestionable that [§ 504] was intended to reach employment discrimination.").

The regulations which the Department of Justice has issued pursuant to the directive of 42 U.S.C. § 12134 explicitly prohibit "discrimination in employment under any service, program, or activity conducted by a public entity." 28 C.F.R. § 35.140. This regulation adopts by reference the requirements of Title I of the ADA, for those public entities also subject to the jurisdiction of Title I, and of the Rehabilitation Act, for such entities not subject to Title I. § 28 C.F.R. § 35.140(b). The Rehabilitation Act has been revised in the wake of the ADA to indicate that the standards of Title I of the ADA are to be "used to determine whether this section has been violated in a complaint alleging employment discrimination." 29 U.S.C. § 794(d). *See also Clark v. City of Chicago,* No. 97–C–4820, 1998 WL 25760, at *3 (N.D.Ill. Jan.12, 1998)("By statute and regulation, the Court must use the standards set forth in Title I of the ADA ... to evaluate the adequacy of ... Title II and Rehabilitation Act claims.")[2]

---

1. *Bledsoe* provides an in-depth analysis of the legislative history of Title II and concludes that "[e]xtensive legislative commentary regarding the applicability of Title II to employment discrimination ... is so pervasive as to belie any contention that Title II does not apply to employment actions." 133 F.3d at 821–822. Because the statutory structure and regulatory language are so clear, and because *Bledsoe*'s legislative

history analysis is so persuasive, no similar analysis is repeated here.

2. Because the standards for determining whether there has been employment discrimination are identical under these various statutory schemes, they can be cited interchangeably.

Because Title II does encompass employment discrimination claims, the MBTA's assertion that the original act of discrimination alleged by Downs occurred prior to the effective date of Title I is of no legal significance.

As the MBTA recognizes, Title II does not impose the same procedural requirements as does Title I. Notably, plaintiffs need not exhaust their administrative remedies before filing suit under Title II. Accordingly, Downs's failure to file a timely charge with the EEOC is no barrier to this suit.

*Statute of Limitations*

■ The MBTA next claims that this action is barred by the statute of limitations. Neither Title II nor the Rehabilitation Act establish a limitations period, and accordingly it is appropriate to adopt the limitation period of the most analogous state statute. Many courts have characterized claims brought under the ADA as personal injury claims. *E.g., Hickey v. Irving Indep. Sch. Dist.*, 976 F.2d 980 (5th Cir.1992); *Doukas v. Metropolitan Life Ins. Co.*, 882 F.Supp. 1197 (D.N.H.1995). The MBTA proposes borrowing Massachusetts' three-year statute of limitations for personal injuries, M.G.L. ch. 260 § 2A; and Downs does not object. This limitation period seems appropriate and is applicable here.

■ The MBTA maintains that Downs's cause of action accrued on May 11, 1992, the date of his pre-employment medical examination, and that Downs's suit is untimely because it was not filed until August 25, 1995—more than three months after the limitations period had run. While the MBTA recognizes that Downs was fired within the limitations period, it contends that his termination was merely a consequence of the alleged past discrimination and not an independently actionable violation.

Downs, on the other hand, argues that in addition to his discriminatory discharge claim, he is also entitled to assert claims stemming from the 1992 medical examination on a continuing violation theory.

Downs's complaint alleges that his rights under the ADA and the Rehabilitation Act were violated on three different occasions: first, on May 11, 1992, when the MBTA required him to undergo a medical examination without having made him a proper conditional offer of employment, and when it made impermissible medical inquiries; second, in February of 1994, when the MBTA violated his right to confidentiality by making his clinical file available to its workers' compensation claims representative; and third, in March and April of 1994, when the MBTA fired him because of his answers to inquiries that impermissibly sought information about his disability status.

Of these allegedly discriminatory acts, only the first falls outside the limitations period. The MBTA argues that any later harm that Downs may have suffered was "merely an effect or consequence" of the May 11, 1992 examination, and that Downs cannot now pursue a claim based on such consequences. *See Kassaye v. Bryant College*, 999 F.2d 603, 606 (1st Cir.1993)("The mere effects or consequences of past discrimination, as opposed to independently actionable violations of Title VII, are insufficient to serve as the trigger of the limitations period.")

This argument is unpersuasive because the MBTA's decisions to release Downs's answers to their earlier medical inquiries, and to fire him because of those answers, represented new and independent acts that cannot be deemed the "mere consequences" of having asked the allegedly improper questions in the first place.

In *Johnson v. General Electric*, 840 F.2d 132, 134–37 (1st Cir.1988), the First Circuit explained that later applications of discriminatory evaluations or practices constitute separate, cognizable discriminatory acts rather than mere consequences of the earlier acts. The *Johnson* court concluded that regardless whether the plaintiff could have earlier brought suit for the institution of an allegedly discriminatory review process (which was begun outside of the limitations period), he could still challenge a promotion denial which admittedly grew out of the review process but which occurred within the limitations period. The court held that "[e]ven if the [later event] is in some sense a 'consequence' of the earlier discrimination, it is also alleged to be an independent discriminatory act in and of itself." 840 F.2d at 137.

In so holding, the court endorsed the reasoning of *Stoller v. Marsh,* 682 F.2d 971 (D.C.Cir.1982), which allowed the plaintiff to challenge a promotion screening that considered discriminatory evaluations which had been placed in his file prior to the limitations period. Although the *Stoller* court recognized that the screening decision was a result of the prior discrimination, it held that "the new direct use of the [old discriminatory evaluation] gives it fresh significance and should be treated as a new and independent act of discrimination." 682 F.2d at 978 (citation omitted).

Similarly, here, Downs's claim that the MBTA relied on his answers to allegedly discriminatory questions in firing him is an allegation of an independent violation. Downs's claim that the MBTA violated his right to confidentiality under these statutes is also sufficiently independent of the 1992 examination to be considered a separately cognizable act.

■ However, although Downs can maintain his claims as to the allegedly discriminatory acts that occurred within the limitations period, he cannot use a continuing violation theory to challenge the 1992 examination because, as he testified at his deposition, he believed the medical inquiries to be impermissible when they were made. The First Circuit has held that

[e]ven where a plaintiff alleges a violation within the appropriate statute of limitations period, the continuing violation claim will fail if the plaintiff was or should have been aware that he was being unlawfully discriminated against while the earlier acts, now untimely, were taking place.

*Provencher v. CVS Pharmacy,* 145 F.3d 5 (1st Cir.1998). While the continuing violation theory allows plaintiffs to challenge actions which they came to recognize as discriminatory only as the defendant's course of conduct continued, that is not the case here as to the 1992 events.

Accordingly, the statute of limitations does not preclude Downs from maintaining his claims that the MBTA fired him because he was disabled, and that it failed to keep his answers to its medical inquiries confidential. It does, however, bar Downs from pursuing his claims that the MBTA impermissibly conducted a pre-offer medical examination, and that it made prohibited inquiries into his disability status.[3]

*Permissibility of Medical Inquiries*

The ADA and the Rehabilitation Act establish a framework according to which different rules govern the permissibility of medical examinations and inquiries at various stages in the hiring process. Employers "shall not conduct a medical examination or make inquiries of a job applicant as to whether such applicant is an individual with a disability," but "may make preemployment inquiries into the ability of an applicant to perform job-related functions." 42 U.S.C. § 12112(d)(2); *see also* 28 C.F.R. § 42.513(a). Once an employer has made an offer of employment to an applicant, it "may require a medical examination ... and may condition an offer of employment on the results" under specified circumstances. 42 U.S.C. § 12112(d)(3); *see also* 28 C.F.R. § 42.513(c).

The MBTA claims that it did not require a physical until after it had extended Downs a conditional offer of employment, and argues that the examination was permissible at that stage. The MBTA also maintains that the challenged inquiries are so closely linked to job performance that they may be proper at any stage of the hiring process. Downs responds that the MBTA had not yet made him an "offer" within the meaning of the ADA and Rehabilitation Act at the time of the medical examination since his hiring was still contingent on variables other than the examination. Downs further alleges that the challenged questions are so directly tied to disability status that they would have been impermissible regardless of their timing.

■ The first question, then, is whether the MBTA had made Downs a conditional offer before the medical examination. Noting the significance of a conditional offer's

**3.** The permissibility of the medical inquiries must still be considered, and is addressed below, because if the questions were proper, Downs's claim that his firing was discriminatory becomes far less tenable.

being "real," the EEOC has explained that a "job offer is real if the employer has evaluated all relevant non-medical information which it reasonably could have obtained and analyzed prior to giving the offer." ADA Enforcement Guidance: Preemployment Disability–Related Questions and Medical Examinations (EEOC Notice 915.002 October 10, 1995), *reprinted in* EEOC Compl. Man. (CCH) ¶ 6903, at 5371, 5378. This requirement is intended to "ensure that an applicant's possible hidden disability (including a prior history of a disability) is not considered before the employer evaluates an applicant's non-medical qualifications." *Id.* at 5371.

In this case, the "Acceptance of Conditional Offer" form that Downs signed did not indicate that the offer was contingent upon a medical examination, but mentioned only a criminal background check. Moreover, the MBTA made its "conditional offer" prior to: allowing Downs to fill out a job application, obtaining various required documents from him, conducting a criminal background check, having Downs take the examination for a CDL permit allowing him to drive a bus, or even interviewing him. The MBTA has made no claim that it could not reasonably have taken any of those steps prior to making Downs an offer and requiring him to undergo examination. *Buchanan v. City of San Antonio,* 85 F.3d 196 (5th Cir.1996) presents a close factual parallel. There, too, the applicant signed an acknowledgment "that he was receiving a conditional offer of employment," but the offer was conditioned not solely on a medical examination but on an entire screening process. 85 F.3d at 199. Under these circumstances, the *Buchanan* court held that the examination was not conducted after a conditional offer had been made. Here, too, the challenged questions were asked in conjunction with a medical examination that took place prior to the making of a conditional offer of employment.

▌ The next question is whether the challenged inquiries—asking whether Downs had ever received workers' compensation, or had ever experienced joint pains—were permissible at the pre-offer stage. The ADA Enforcement Guidance provides that an employer may not ask disability-related questions prior to making a conditional job offer, and defines a "disability-related question" as one "that is likely to elicit information about a disability." EEOC Compl. Man. ¶ 6903, at 5372. What an employer *may* do at the pre-offer stage is "make inquiries into the ability of an applicant to perform job-related functions." 42 U.S.C. § 12112(d)(2)(B).

The ADA Enforcement Guidance includes examples which are useful in discerning the line between improper disability-related questions and acceptable questions about job performance. Most relevant here is the statement that an "employer may not ask applicants about job-related injuries or workers' compensation history" at the pre-offer stage. Further guidance can be found in the appendix to the implementing regulations. There, the EEOC explains that "inquiries into the ability of an applicant to perform job-related functions . . . must be narrowly tailored," and, more to the point, that "[a]n employer may not use an application form that lists a number of potentially disabling impairments and ask the applicant to check any of the impairments he or she may have." 29 C.F.R. pt. 1630, App. 1630.14(a). The form on which Downs indicated he had not suffered from joint pain was precisely this type of form. In light of these authorities, and the fact that the challenged inquiries were not directly tied to Downs's ability to drive a bus, it appears that these questions were impermissible as disability-related inquiries.

*Elements of Discriminatory Discharge Claim*

*1. Did Downs Have a Disability?*

▌ To maintain his claim, the Downs must establish that he was disabled within the meaning of the ADA and the Rehabilitation Act. These statutes define an individual with a disability to include one who has "a physical or mental impairment that substantially limits one or more of [his] major life activities, . . . has a record of such an impairment, [or is] regarded as having such an impairment." 42 U.S.C. § 12102(2); 29 U.S.C. § 706(8)(B). Both Downs and the MBTA argue that they are entitled to sum-

mary judgment as to Downs's disability status.

Downs argues that his history of workers' compensation injuries establishes that he has a record of a disabling impairment since his prior elbow and back injuries had previously substantially limited his ability to work. The MBTA counters that Downs's history does not show that any major life activities were "substantially" limited by his prior injuries since he missed only temporary work periods totaling approximately one year. The MBTA also argues that Downs's later ability to work, including his ability to pass the MBTA's own medical examination, showed that his prior injuries were not sufficiently severe as to constitute a disability.

The implementing regulations establish that an employee who has previously had a disabling impairment from which he has recovered in whole or in part has a record of a disability. 29 C.F.R. § 1630.2(k). The nature and severity of an impairment, its duration or expected duration and its long-term or anticipated long-term impact (including any lingering effects) are all relevant to determining whether an impairment is substantially limiting. *See Katz v. City Metal Co.,* 87 F.3d 26, 31 (1st Cir.1996). While the MBTA describes Downs's injuries as purely "short-term" and "temporary," the MBTA's own view of past injury as relevant to present ability indicates its recognition of the possibility of long-term effects. The determination of whether a given impairment is disabling is fact-intensive, and it cannot be said on the present record that either Downs or the MBTA is entitled to judgment as a matter of law.

■ Downs next alleges that the MBTA's conduct toward him shows that it regarded him as disabled in that the MBTA believed, without justification, that he would endanger public safety and increase its workers' compensation costs. The MBTA responds that it could not have regarded Downs as disabled since it had no knowledge of his impairments because he had answered its questions falsely.

The flaw in the MBTA's argument is that it considers only what the MBTA knew at the time Downs was hired, and not the later-acquired information that led to his termination. While there is no indication that the MBTA regarded Downs as disabled when it hired him, Downs has presented sufficient evidence to allow a jury to conclude that the MBTA *did* view him as disabled when it decided to fire him.

The EEOC Compliance Manual explains that coverage for those regarded as disabled

> is designed to protect against myths, fears, stereotypes, and other attitudinal barriers about disability. Common attitudinal barriers include ... concerns about productivity, safety, insurance, liability, ... Quite often, employers will assume, without any objective evidence, that a person's physical or mental condition will cause problems in these areas. The ADA is designed to prevent employment discrimination based on mere speculation and unfounded fears about disability.

EEOC Compl. Man. (CCH) § 902.8, ¶ 6888 at 5325. Downs has submitted deposition testimony indicating that the MBTA viewed the challenged questions as relevant to determining whether he could safely drive a bus and whether he was likely to increase its workers' compensation costs. Indeed, the MBTA's current attempt to justify its questions as directly related to job performance supports Downs's claim that it regarded his (past or continuing) impairment as substantially limiting. *Compare Cook v. Rhode Island Dep't of Mental Health, Retardation, and Hospitals,* 10 F.3d 17 (1st Cir.1993)(refusal to hire due to unfounded fears and assumption that applicant's morbid obesity could interfere with her job performance and increase chance of workers' compensation claims violates Rehabilitation Act).

Nonetheless, Downs has not presented sufficient evidence to compel a finding that the MBTA regarded him as disabled. As events unfolded, it is not clear whether the MBTA would have regarded Downs's impairment as sufficiently severe to substantially limit his ability to work. Because this is a fact question, summary judgment is not justified.

*2. Was Downs a "Qualified Individual with a Disability"?*

■ The next element Downs must prove to establish his claim is that he was a quali-

fied individual with a disability, or, in the language of the Rehabilitation Act, that he was "otherwise qualified," for the position of bus driver. 42 U.S.C. § 12132; 29 U.S.C. § 794. Downs maintains that it is indisputable that he was qualified for the position since he had performed the job without limitation from his hiring until his 1994 injury, and his doctor cleared him to resume work following surgery on his elbow. The MBTA contends that Downs was not qualified because his misconduct in falsifying his application shows that he is unfit for the position.

"A qualified individual is one who can perform the essential functions of the job held." *EEOC v. Amego, Inc.*, 110 F.3d 135, 142 (1st Cir.1997). A disabled employee who engages in misconduct may be deemed "not otherwise qualified" for his position. *See, e.g., Little v. FBI*, 1 F.3d 255 (4th Cir.1993); *Hogarth v. Thornburgh*, 833 F.Supp. 1077 (S.D.N.Y. 1993); *Garrity v. United Airlines*, 421 Mass. 55, 63, 653 N.E.2d 173 (1995)("[A] handicapped employee who engages in conduct significantly inimical to the interests of his employer and in violation of the employer's rules is not an 'otherwise qualified' person.").

Although some courts have applied this principle to hold that disabled applicants or employees who have falsified information on their application forms are not otherwise qualified for employment, *e.g., Hartman v. City of Petaluma*, 841 F.Supp. 946 (N.D.Cal. 1994); *Russell v. Frank*, 1991 WL 97456 (D.Mass. May 23, 1991), *aff'd* 971 F.2d 744 (1st Cir.1992), *cert. denied*, 507 U.S. 925, 113 S.Ct. 1296, 122 L.Ed.2d 686 (1993), such cases are distinguishable from the situation at hand in that Downs's false statements were in response to impermissible questions posed by the MBTA. As the Board of Review that ruled on Downs's application for unemployment benefits recognized, this fact is significant in determining whether Downs's actions can be considered misconduct or action against the MBTA's legitimate interests. That Board concluded that "since the employer asked unlawful questions, the claimant's failure to answer them truthfully cannot be deemed to be deliberate misconduct in wilful disregard of the employing unit's inter-

est or to be a knowing violation of a reasonable rule or policy of the employer."

This analysis is consistent with that of *Kraft v. Police Commissioner of Boston*, 410 Mass. 155, 571 N.E.2d 380 (1991). There, a police officer was fired after five years of service when the department learned that, on his application form, he had given false answers to questions seeking information about any prior hospitalization for mental illness. The Supreme Judicial Court ("SJC") held that M.G.L. ch. 151B § 4(9A) prohibited employers from asking such questions of job applicants, and concluded that the police commissioner "had no authority to discharge Kraft for giving false answers to questions that the commissioner under law had no right to ask." 410 Mass. at 157, 571 N.E.2d 380. More recently, the SJC elaborated on the *Kraft* decision by explaining that any other result "at best would have ignored the employer's unlawful inquiries, and at worst would have rewarded the employer for them. In either event, employers in the future would have been encouraged to violate the law." *Lysak v. Seiler Corp.*, 415 Mass. 625, 628, 614 N.E.2d 991 (1993). *See also Huisenga v. Opus Corp.*, 494 N.W.2d 469, 473–74 (Minn.1992)(an employer may not rely on an employee's false answers to impermissible questions about past injuries and workers' compensation claims to avoid its workers' compensation obligations).

The reasoning of these cases is persuasive: an employer that violates its employees' rights by asking impermissible questions ought not be able to base adverse employment decisions on the resulting answers (to which it was not entitled in the first place). The problem with the MBTA's analysis is that it equates Downs's false responses with misconduct, pure and simple, without recognizing that the responses were triggered by its own improper actions. Had the MBTA not overstepped the bounds set by the ADA, the misconduct at issue never would have occurred. Moreover, the challenged inquiries seem problematic not only in that they violated the ADA and Rehabilitation Act, but also in that they set up a situation that is likely to "trap" a disabled applicant into making false statements that a non-disabled ap-

plicant has no incentive to make. As the *Huisenga* court explained, "overreaching invites deceit. If an employer asks only questions tailored to the requirements of a specific job, ... it is more likely that it will get honest responses." 494 N.W.2d at 474.

The MBTA suggests that Downs's only permissible course of conduct when confronted with questions he believed to be against the law was to answer honestly and challenge any adverse decision that resulted from the answer. Had the MBTA asked its questions *after* it had made Downs a true conditional offer of employment, this suggestion would be persuasive. If the MBTA had made its offer after evaluating all of Downs's non-medical qualifications, then Downs would have been able to link any adverse decision to his responses to the medical inquiries, and so present a disability discrimination claim. The distinction between what may be asked in the pre–and post–offer stages is designed to facilitate discovery of discrimination. *See* EEOC Compl. Man. (CCH) ¶ 6903, at 5371 ("If the employer rejects the applicant after a disability–related question or medical examination, investigators will closely scrutinize whether the rejection was based on the results of that question or examination.") Here, however, since the inquiries were made while many stages of the hiring process—including a subjective interview—had yet to be completed, it would have been difficult to attack a negative decision as having been based on the medical questions.

In sum, the MBTA cannot rely on Downs's false answers to its impermissible questions to establish that he was not "otherwise qualified" for his position as a bus driver.

*Confidentiality Requirement*

The ADA and the Rehabilitation Act require that "information obtained regarding the medical condition or history of [an] applicant [be] collected and maintained on separate forms and in separate medical files and [be] treated as a confidential medical record." 42 U.S.C. § 12112(d)(3)(B); *see* 28 C.F.R. § 42.513(d). Release of this information is permitted only as follows:

(i) supervisors and managers may be informed regarding necessary restrictions on the work or duties of the employee and necessary accommodations;

(ii) first aid and safety personnel may be informed, when appropriate, if the disability might require emergency treatment; and

(iii) government officials investigating compliance with this chapter shall be provided relevant information on request.

*Id.*

■ Downs contends that the MBTA violated this provision by allowing its workers' compensation claims representative unlimited access to his medical file since the representative does not fit into any of the above-listed authorized categories. The MBTA replies that Downs himself had authorized the release of his medical file by signing its "Accident Reporting and Treatment Form" after the 1994 exacerbation of his elbow injury.

That form contains the following provision:

I hereby authorize MBTA (or any of its authorized representives [sic]) to be furnished any information and facts regarding *this injury* ... This information is to be used for the purpose of evaluating and handling my claim for injury as a result of an incident as described above and *for no other purpose,* now or in the future.

(emphasis added). The scope of this provision is too narrow to support the MBTA's claim that Downs had authorized release of his medical history form and of information from his 1992 medical examination. Not only is the release limited to information relating to the 1994 injury, the release expressly states that information provided pursuant to it is to be used "for no other purpose" than evaluating the claim of injury. In relying on the information it discovered to fire Downs, the MBTA far exceeded the permitted use of the information.

Nor does the release of Downs's medical file to the claims representative fall within any of the permissible uses of this confidential information under the ADA and Rehabilitation Act. As Downs points out, the claims representative is neither a supervisor or manager, nor a first aid or safety person, nor a government investigator. Moreover, the purpose for which the information was

sought and used does not meet any of the purposes recited by the ADA and Rehabilitation Act. Accordingly, the MBTA's release of Downs's medical file violated his right to confidentiality under these statutes.

*State Workers' Compensation Act Claim*

■ The Massachusetts Workers' Compensation Act, M.G.L. ch. 152 § 75B(2) provides that "no employer ... shall discharge ... an employee because the employee has exercised a right afforded by this chapter." Downs contends that the MBTA violated this act in that his prior workers' compensation claims, and his pursuit of a workers' compensation claim in 1994, "directly resulted" in his firing. The MBTA replies that its action was not predicated on Downs's workers' compensation claims, but instead on the fact that he had lied about them.

Massachusetts courts offer little guidance as to the applicable standards for determining when an employer has acted "because" of the employee's assertion of workers' compensation rights. Several other courts have considered situations in which an employee's workers' compensation claim led to the discovery of information that in turn led to the employee's termination. In *Thomlison v. City of Omaha*, 63 F.3d 786 (8th Cir.1995), an investigation of a firefighter's workers' compensation claim led to the discovery that she had falsified her medical history on her application, and she was fired because of the falsification. The court upheld a jury verdict finding the discharge to have been discriminatory, explaining that because of the "strong temporal connection ... between Thomlison's medical condition and the sudden discovery of the alleged falsification ...", a jury could rationally infer that the Fire Division began treating Thomlison differently due to a perception about her medical condition." 63 F.3d at 789. In contrast, in *Brooks v. Director, Office of Workers' Compensation Programs*, 2 F.3d 64 (4th Cir. 1993), the court held that an employee who was fired for falsifying his medical history was discharged "because he breached a company rule and not because of [the] work-related disability" that led the company to discover his misconduct.

Determining whether Downs was fired in retaliation for his prior and 1994 workers' compensation claims requires looking into the MBTA's attitude. It is not enough for Downs to show that his workers' compensation claims were a but-for cause of his firing. Rather, the claims must have been a motivating factor for the discharge to be considered retaliatory. Because Downs has presented evidence indicating that the MBTA viewed past workers' compensation claims as a likely indicator of future claims, he may be able to argue that the MBTA's decision to fire him, rather than use some other form of progressive discipline, was motivated in part by his workers' compensation claims. Moreover, as the court in *Ourfalian v. Aro Mfg. Co.*, 31 Mass.App.Ct. 294, 295 n. 3, 577 N.E.2d 6 (1991), explained in allowing plaintiff's claim of retaliatory discharge to go forward, "[w]hen, as here, 'intent is at the core of a controversy, summary judgment seldom lies.'" Accordingly, neither party's motion for summary judgment under this act is granted.

\*   \*   \*   \*   \*   \*

In sum, the parties' motions for summary judgment are disposed of as follows: the MBTA's motion is granted insofar as it seeks dismissal, on statute of limitations grounds, of Downs's claims that it violated the ADA and the Rehabilitation Act by ordering a pre-employment medical examination and by asking impermissible questions; Downs's motion is granted insofar as it seeks judgment that the MBTA violated his right under the ADA and Rehabilitation Act to have his medical files kept confidential; in all other respects, both motions are denied.

It is so ordered.